Gerald L. Maatman, Jr. **JUDGE HOLWELL**
Douglas B. Lipsky
SEYFARTH SHAW LLP
620 Eighth Avenue, 32nd Floor
New York, New York 10018
(212) 218-5500

# 11 CIV 4314

Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------- x

ANDREW S. COHEN,

                Plaintiff,

    v.

AVANADE, INC., MATTHEW MCCAFFERTY,
AND AZIZ VIRANI,

             Defendants.

-------------------------------------- x

:  Civil Action No. TBD

## NOTICE OF REMOVAL

TO:   Clerk of the Court
      U.S. District Court for the Southern District of New York
      Daniel Patrick Monyihan U.S. Courthouse
      500 Pearl Street
      New York, New York 10007-1312

PLEASE TAKE NOTICE that Defendants Avanade, Inc. ("Avanade"), Matthew

McCafferty ("McCafferty") and Aziz Virani ("Virani") (collectively "Defendants"), by their

attorneys, Seyfarth Shaw LLP, and pursuant to 28 U.S.C. §§ 1332 and 1441, file this Notice of

Removal with respect to the case entitled Andrew S. Cohen v. Avanade, Inc., Matthew

McCafferty and Aziz Virani, Index No. 102656-2011 ("the State Court Action"), which has been

filed in the Supreme Court of the State of New York, County of New York.  In support of this Notice, Defendants state as follows:

Service and Parties

1.      On or about March 4, 2011, Plaintiff Andrew S. Cohen ("Cohen") filed a Complaint (the "Complaint") with the Clerk of the Supreme Court of the State of New York, County of New York.  This filed Complaint was never served upon Avanade.  A copy of the Summons and Complaint is attached hereto as Exhibit A.

2.      On or about May 17, 2011, Cohen filed a First Amended Complaint ("Amended Complaint") with the Clerk of the Supreme Court of the State of New York, County of New York.  On May 26, 2011, Avanade was served with the Amended Complaint through its counsel.  A copy of the Amended Complaint is attached hereto as Exhibit B.

3.      Cohen alleges breach of contract, fraud, and negligent misrepresentations.

Timeliness of Removal

4.      Avanade was served with the Amended Complaint on May 26, 2011.  This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b) because such notice is filed within thirty (30) days of service.  To date, Cohen has not completed service of either the original Complaint or the Amended Complaint upon the individual defendants, McCafferty and Virani.  Defendants have filed no pleadings in this matter.

Basis for Removal

5.      This Court has original jurisdiction over this action by reason of diversity of citizenship under 28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

6.      Cohen is a citizen of the State of New York (Amended Complaint ¶ 1).  Avanade, Inc. is a citizen of the State of Washington because it is a corporation organized and existing

under the laws of the State of Washington, and has its principal place of business in the State of Washington.  28 U.S.C. § 1332(c)(1).  McCafferty is a citizen of the Commonwealth of Massachusetts.  Virani is a citizen of the State of Washington.  Complete diversity therefore exists among the parties.

7.     Defendants believe in good faith that the amount in controversy in this case exceeds $75,000, exclusive of interest and costs, as required by 28 U.S.C. § 1332(a).  In support of their good faith belief, Defendants rely on the allegations of the Amended Complaint, and Cohen's prayer for relief.  Specifically, Cohen alleges that Defendants' conduct financially harmed him in the amount of $180,000.00 (Amended Complaint ¶¶ 16, 28, 35, 39), and in his prayer for relief, Cohen seeks (1) compensatory damages "including but not limited to the sum of $180,000"; (2) interest, (3) attorneys' fees, (4) costs of suit, and (5) "other relief as the Court deems appropriate."  (Amended Complaint, "Wherefore" clause.)  Collectively, if Cohen was to prevail at trial, these items would exceed $75,000.

8.     Because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, this Court has original jurisdiction over the case pursuant to 28 U.S.C. § 1332(a) and this case may be removed pursuant to 28 U.S.C. § 1441(a).

9.     This Notice of Removal is being filed in the United States District Court for the Southern District of New York, the district court for the district and division within which the State Court Action is pending.  28 U.S.C. § 1441(a).

10.     Defendants will file a copy of this Notice of Removal with the Clerk of the Supreme Court of the State of New York, County of New York, to effect removal of this action to this Court pursuant to 28 U.S.C. § 1446(d).

11.     By filing this Notice of Removal, Defendants do not waive any defenses available to them at law, in equity or otherwise.

Process and Pleadings

12.     Pursuant to 28 U.S.C. § 1446(a), the attached copy of the Summons and Complaint and Amended Complaint constitute all processes, pleadings and others served upon Avanade in this action to the present date.

WHEREFORE, Defendants respectfully request that the above-referenced civil action proceed in the United States District Court for the Southern District of New York as an action properly removed thereto.

Dated: June 24, 2011

<div style="margin-left:40%">

Respectfully submitted,

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

By: _____
        Gerald L. Maatman, Jr.
        Douglas B. Lipsky

Attorneys for Defendants

</div>

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No.

ANDREW S. COHEN,

                    Plaintiff,

     -against-

AVANADE, INC., MATTHEW MCCAFFERTY, AND
AZIZ VIRANI,

                    Defendants.

Plaintiff designates
New York
County as the place
of trial
The basis of the venue is
Plaintiff's residence and
Defendants Offices.

**11102656**

*SUMMONS*

Plaintiff's residence
is 45 West 67th Street,
New York, New York

*To the above named Defendants*

**You are hereby summoned** *to answer the complaint in this action and to
serve a copy of your answer, or, if the complaint is not served with this summons, to
serve a notice of appearance, on the Plaintiff's Attorney(s) within    20 days after the
service of this summons, exclusive of the day of service (or within 30 days after the
service is complete if this summons is not personally delivered to you within the State of
New York); and in case of your failure to appear or answer, judgment will be taken against
you by default for the relief demanded in the complaint.*

*Dated:*   New York, New York
          February 25, 2011

*Defendants' Address:*

David Scillieri, Esq.
*Attorneys for Plaintiff*
406 Route 46 East
Elmwood Park, New Jersey 07407
(201)796-5263

Avanade Inc
320 West 13th Street
New York, New York 10014

Matthew Mccafferty
c/o Avanade
320 West 13th Street
New York, New York 10014

Aziz Virani
c/o Avanade
320 West 13th Street
New York, New York 10014

**DAVID SCILLIERI, ESQ.**
406 Route 46 East
Elmwood Park, New Jersey 07407
(201) 796-5263
Attorney for Plaintiff

| | |
|---|---|
| ANDREW S. COHEN,<br><br>Plaintiff<br><br>vs.<br><br>AVANADE, INC., MATTHEW MCCAFFERTY, and AZIZ VIRANI.<br><br>Defendants. | SUPREME COURT OF THE STATE OF NEW YORK<br><br>COUNTY OF NEW YORK<br><br>INDEX NO.<br><br>*CIVIL ACTION*<br><br>**COMPLAINT** |

The Plaintiff, Andrew Cohen, residing at 45 West 67th Street, Apartment 12J, Manhattan, City of New York, County of New York, State of New York, by way of Complaint against the Defendants, says:

## THE PARTIES

1.      The Plaintiff, Andrew S. Cohen ("Plaintiff") is an individual residing in New York State at all relevant times pertinent to this Complaint.

2.      Upon information and belief, the Defendant, Avanade, Inc. ("Avanade") is a company incorporated in the State of Washington.  At all times relevant to this Complaint, Avanade maintained an office in New York State, having an address of 320 West 13th Street, 5th Floor, New York, New York, 10014.

3.    The Defendant, Matthew McCafferty ("McCafferty"), at all times relevant to this Complaint, was a Vice-President of Avanade.

4.    The Defendant, Aziz Virani ("Virani"), at all times relevant to this Complaint, was an Executive Vice-President of Avanade.


## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

5.    During the period of February through May 2009, the Plaintiff was recruited by McCafferty and Virani on behalf of Avanade, which was seeking an individual to fill a position as a Business Development Executive in Application Management.

6.    During their recruitment of the Plaintiff, During the period of February through May 2009, McCafferty and Virani made various statements and representations to the Plaintiff which induced the Plaintiff to accept an offer of employment made by Avanade to the Plaintiff. Among these representations was the assertion that Avanade possessed a true, well-established, fully capable, and experienced Application Management delivery system and services.

7.    Based upon the representation set forth in paragraph six above, the Plaintiff accepted an offer of employment from Avanade as a Business Development Executive in Application Management which included a commission based sales compensation plan.

8.    The statements and representations made by McCafferty and Virani described in paragraph six above were false.

9.    For the reasons set forth below, Avanade did *not* possess a true, well-established, fully capable, and experienced Application Management delivery system and services at the time that the Plaintiff was hired as an Avanade employee.

10.     **First,** Avanade did not possess an Application Management delivery methodology that could assure a consistent, standardized delivery approach for Application Management services by qualified Application Management services personnel.  Instead, Avanade only possessed three or four PowerPoint slides that described very small elements of an Applications Management services delivery approach.  In the Plaintiff's extensive experience selling Application Management services for well established firms such as EDS (Electronic Data Systems), Deloitte & Touche, NTT (Nippon Telegraph and Telephone), and CSC (Computer Sciences Corporation), each of these firms possessed Application Management services delivery methodologies documented in hundreds of pages of text, graphic representation, and automated toolsets.

11.     **Second,**  Avanade did not possess any qualified Application Management Service delivery personnel on its staff.  The Avanade Applications Management team consisted of business development executives (the Plaintiff, Sudip Mehta, Ryan Ronan, Matt McCafferty, Chuck Follen), presales engineers (Rick Kranick and Andy Marselos), and various finance/administration personnel.  In fact, McCafferty referred to the Avanade Application Management team as a sales organization and not a delivery organization.  Virani referred to it as a "start-up" organization at the team meeting held in Chicago in September 2009.

12.     **Third,** Avanade did not possess a pricing scheme or pricing model that could address and properly price typical multi-year Application Management services deals with clients.  Avanade Application Management services presales personnel were required to use appropriate pricing models from Avanade's affiliate company, Accenture.  These Accenture pricing models were not well understood by Avanade Application Management service presales

personnel.  As a result presales personnel took weeks to prepare pricing schemes for the Plaintiff's deals, and often produced inaccurate or unacceptable pricing outputs.

13.     **Fourth,**  Avanade did not possess structured legal documents to support Application Management services deals.  When the Plaintiff joined Avanade,  McCafferty indicated that he and the Avanade legal staff were still drafting these documents.  During the recruiting and interview process, the Plaintiff specifically asked McCafferty if such legal documents and support were in place.  McCafferty falsely stated that such documents and support were in place at Avanade.  The Plaintiff's extensive experience selling complex, multi-year Application Management services deals gave him the knowledge that without such legal documentation and support in place, the deals he sought on behalf of Avanade would be unacceptably delayed.

14.     **Fifth,**  Avanade did not possess well-defined, established, and tested Service level Agreement (SLA) metrics to apply in Application Management service deals with the client community.  These SLAs are standard requirements in the delivery of Application Management services and well accepted as common practice within the Application Management services industry.

4

## Avanade Application Management Services Deals Developed by Plaintiff

15.     The Plaintiff worked in developing two major deals for Avanade in the fiscal year 2010, both of which would have closed had Avanade possessed a true, well-established, fully-capable, and experienced Application Management delivery capability, as McCafferty and Virani falsely stated was present at Avanade at the time of the recruiting and interviewing process with the Plaintiff.

16.     Together, these two deals would have exceeded $10 million in total sales for Avanade, which would have enabled the Plaintiff to achieve his full incentive bonus in fiscal year 2010 of $180,000.

17.     The first deal was for a client named Group M in New York City.  The Plaintiff spent more than three months (September 2009 –early December 2009) developing this opportunity for Avanade by meeting with and working on a daily basis with key Group M decision makers John Donnarumma (Chief Information Officer or "CIO"), Paul Gilbert, Jayne Oh, and John DeGiglio.  The Plaintiff worked extremely hard on this opportunity, working most weekends during this three-month period, as well as early mornings and late evenings.  The Plaintiff successfully negotiated the opportunity into a three-year deal that would have generated at least $5 million in sales for Avanade.

18.     However, it was during these three-months of intense effort that the Plaintiff realized that the Applications Management services delivery team tasked with preparing the proposed technical and management solutions for Group M was either seriously deficient in its complement of experienced Applications Management service delivery personnel or was woefully incompetent.  It was in fact the client's recognition of this deficiency and incompetence, especially by Mr. Gilbert, Ms. Oh, and Mr. DeGiglio, that caused them to express

5

their serious doubt as to Avanade's credibility in the Application Management services space, and to seek vendor support for their deal elsewhere. On more than one occasion, Ms.Oh and Mr. DeGiglio expressed this concern to the Plaintiff. They told the Plaintiff that they truly appreciated the significant effort he delivered to Group M during the three-month period, but that they had no confidence in Avanade's delivery capability. This message was delivered emphatically by Ms. Oh in a telephone call in October 2009. It was delivered again by Ms. Oh and Mr. DeGiglio during a final presentation meeting with Group M in November 2009. This message was finally delivered by Mr. Gilbert to Avanade Vice-President, Chris Paradise, in a phone call in December 2009.

19.     The Plaintiff's participation in this effort was a source of great professional embarrassment, and damaged his credibility in front of a major client in the New York based Media industry.

20.     The second and more significant deal opportunity was with a firm named Mediabrands, which is based in New York City. Starting in January 2010 and extending through the end of the Avanade fiscal year 2010, the Plaintiff made significant efforts to develop this substantial deal opportunity for Avanade.

21.     Had the Mediabrands deal closed, it would have generated in excess of $10 million in sales for Avanade over a multi-year period. This deal was lost because Avanade did not possess a well established and capable Applications Management service delivery team, a detailed methodology for Application Management service delivery, and a credible service delivery team with the requisite skill sets.

22.     The Plaintiff developed the opportunity with Mediabrands in collaboration with Steve MacKinnon (a Business Development Executive in Avanade's New York office) and Jim

Olson (Zone Director in Avanade's New York office). MacKinnon and Olson had already

successfully sold an applications development project to Mediabrands. Therefore, Mediabrands

was an existing client for Avanade. The Plaintiff was presented to the Mediabrands CIO, Scott

Beltran, in order to begin and manage the Application Management deal sales cycle, and to

interact with the Application Management service delivery team, whose responsibility was to

accurately scope the composition of the deal and define a credible level of effort estimate, a

solution plan, and deal pricing.

23.     Avanade's services delivery team was unable to accomplish any of its

responsibilities. The team, consisting of Avanade personnel Rick Krajnik, Andrew Marselos,

and Lily Gui, did not possess the experience or appropriate skill sets necessary to accomplish

these tasks. After the Plaintiff expended significant efforts on the Mediabrands deal, which

included composing and leading a deal scoping process (which in reality was a responsibility of

the Applications Management services delivery team), traveling to and working in Asia for over

two weeks, it became evident to Avanade's executive leadership that Avanade did not possess

the experience and skill sets to develop and deliver an Applications Management deal. This

became evident to the Plaintiff in a series of conference calls in June of 2010, in which Avanade

senior executives Howard Kilman, Jack Dreiss, Mick Slattery, Virani and CEO, Adam Warby,

participated. Jim Olson, McCafferty, Rick Krajnik, Andrew Marselos, Steve MacKinnon, and

the Plaintiff also participated in these calls.

24.     It was during these calls that Jack Dreiss first raised the issue of risk of delivery

for this potential deal with Mediabrands. Dreiss showed great concern in this respect, and

explicitly stated that Avanade had never delivered a deal of this type - a statement in sharp

contradiction to what the Plaintiff was told by McCafferty and Virani during the Plaintiff's

7

recruiting process.  Mr. Dreiss was responsible for overall service delivery for Avanade in its

Americas region. Howard Kilman, the Avanade executive responsible for all Americas region

business, echoed Mr. Dreiss' comments.  He agreed that Avanade had never delivered such a

deal and that it would be the company's first.  Mr. Kilman even commented at one point during

these calls that "we do not know what we are doing in this space but we want to be in it," which

dearly expressed Avanade's lack of a well established and credible Applications Management

service delivery capability.  Virani and McCafferty, both on the calls, did not contradict Mr.

Kilman's or Mr. Dreiss' statements.

25.     All involved in these calls suggested that Avanade borrow from its affiliate,

Accenture, a well established firm in the Application Management services delivery space, the

appropriate methodology, estimating tools, pricing model, and ultimately, the appropriate human

resources with the appropriate skill sets.  Mr. Dreiss explicitly stated in a conference call on or

about June 15, 2010, that "we have not done this before so using Accenture's approach and

models is best."   In the end, Avanade personnel were not capable to use the borrowed

Intellectual Property of Accenture and Avanade was not successful in attempting to borrow

Accenture experienced personnel.  As a result, the Mediabrands deal collapsed.

26.     Both Jim Olson and Steve MacKinnon, recognizing Avanade's lack of experience

and capability in the Application Management service delivery space, refused to allow Avanade

to bring a proposal to the Mediabrands CIO (Scott Beltran), for this potential deal.  This assured

the deal's failure.  At one point in the New York office, Jim Olson and colleague Zone Executive

Ed Schwartz, joked that the Plaintiff should go out and get an experienced firm that could fulfill

the deal for Mediabrands, given Avanade's lack of capability in this area.

27.     This experience greatly embarrassed the Plaintiff, and damaged his credibility in front of Mediabrands CIO, Scott Beltran, a major player in the large New York based Media industry.

28.     Avanade hired the Plaintiff without possessing the appropriate capability to credibly propose and deliver Applications Management service deals.  As a result, the Plaintiff was denied the opportunity to close two major deals that would have generated his full incentive bonus of $180,000 for the fiscal year 2010.

29.     The Plaintiff also endured professional embarrassment and had his professional reputation damaged as a result of Avanade's inability and incompetence.

30.     The Plaintiff's employment with Avanade ended on September 16, 2010.

## FIRST CAUSE OF ACTION

31.     The Plaintiff repeats the allegations of all preceding paragraphs and incorporates the same into this Count as if set forth at length herein.

32.     Under the employment contract and arrangements, the Plaintiff was to be compensated by Avanade in several ways, pursuant to specific formulas and other provisions.

33.     The Plaintiff's contract of employment with Avanade included the provisions contained in the Avanade Total Rewards Sales Compensation Plan for the Avanade Fiscal Year (September 1, 2009-August 31, 2010).

34.     Had Avanade possessed a true, well-established, fully-capable, and experienced Application Management delivery capability, the deals worked on and negotiated by the Plaintiff

9

with both Group M and Mediabrands would have come to fruition and would have resulted in a finalized contract with those entities.

35.     In the event that the Group M and Mediabrands deals had been finalized, pursuant to the Avanade Total Rewards Sales Compensation Plan for the Avanade Fiscal Year (September 1, 2009-August 31, 2010), the Plaintiff would have earned $180,000.

36.     With respect to the Group M and Mediabrand assignments, the Plaintiff duly performed for Avanade all of the services and other duties which he had undertaken and promised to do under the employment agreement and arrangements.  In this respect, the Plaintiff tendered substantial performance under his employment contract with Avanade.

37.     By failing to possess a true, well-established, fully-capable, and experienced Application Management delivery capability, Avanade materially breached its contract with the Plaintiff.

38.     The Plaintiff has failed and refused to compensate the Plaintiff for the substantial performance of his duties with regard to the Group M and Mediabrands deals.

39.     As a consequence of Avanade's breach, there is now due and owing from Avanade to the Plaintiff the sum of $180,000, together with interest thereon from September 16, 2010.

WHEREFORE, the Plaintiff demands from the Defendants the sum of $180,000, together with interest, attorney's fees, costs of suit, and for such other relief as the Court deems appropriate.

## SECOND CAUSE OF ACTION

40.     The Plaintiff repeats the allegations of all preceding paragraphs and incorporates the same into this Count as if set forth at length herein.

41.     During their recruitment of the Plaintiff, during the period of February through May 2009, McCafferty and Virani made various statements and representations to the Plaintiff which induced the Plaintiff to accept the offer of employment made by Avanade to the Plaintiff. Among these representations was the assertion that Avanade possessed a true, well-established, fully capable, and experienced Application Management delivery system and services.

42.     Based upon these representations set forth in paragraph 41 above, the Plaintiff accepted an offer of employment from Avanade as a Business Development Executive in Application Management.

43.     Plaintiff entered into his employment with Avanade in reliance upon the statements and representations set forth in paragraph 41 above.

44.     The statements and representations made by McCafferty and Virani described in paragraph 41 above were materially false.

45.     Plaintiffs' willingness to assent to the employment contract with Avanade was caused by the material fraudulent misrepresentations of Avanade and its agents and employees.

46.     The Plaintiff has been damaged by the actions of Avanade and its agents and employees.

WHEREFORE, the Plaintiff demands from the Defendants damages, including but not limited to the sum of $180,000, together with interest, attorney's fees, costs of suit, and for such other relief as the Court deems appropriate.

## THIRD CAUSE OF ACTION

47.     The Plaintiff repeats the allegations of all preceding paragraphs and incorporates the same into this Count as if set forth at length herein.

48.     The conduct of Avanade and its agents and employees towards the Plaintiff was malicious, fraudulent, oppressive and/or recklessly committed, with wanton disregard of the Plaintiff's rights.

49.     The conduct of Avanade and its employees and agents exhibited bad faith.

WHEREFORE, the Plaintiff demands from the Defendants damages, including but not limited to the sum of $180,000, and punitive damages, together with interest, attorney's fees, costs of suit, and for such other relief as the Court deems appropriate.

## FOURTH CAUSE OF ACTION

50.     The Plaintiff repeats the allegations of all preceding paragraphs and incorporates the same into this Count as if set forth at length herein.

51.     Avanade's failure to possess the promised true, well-established, fully capable, and experienced Application Management delivery system and services directly caused the failure of the Plaintiff to consummate the deals with Group M and Mediabrands.

52.     This experience greatly embarrassed the Plaintiff, and damaged his credibility in front of Mediabrands CIO, Scott Beltran, a major player in the large New York based Media industry.

12

53.     This experience also greatly embarrassed the Plaintiff, and damaged his credibility in front of Group M and its employees, a major client in the New York based Media industry.

54.     The Plaintiff endured professional embarrassment and had his professional reputation damaged as a result of Avanade's inability and incompetence.

WHEREFORE, the Plaintiff demands from the Defendants damages, punitive damages, interest, attorney's fees, costs of suit, and for such other relief as the Court deems appropriate.

## FIFTH  CAUSE OF ACTION

55.     The Plaintiff repeats the allegations of all preceding paragraphs and incorporates the same into this Count as if set forth at length herein.

56.     In making the representations referred to in paragraph 41 above, the Defendants owed Plaintiff a duty to provide him with accurate advice which was in the Plaintiff's best interests.

57.     In making the representations referred to in paragraph 41 above, the Defendants acted negligently and unreasonably and breached this duty by advising the Plaintiff that Avanade possessed a true, well-established, fully capable, and experienced Application Management delivery system and services.

58.     As a direct and proximate result of Defendants' wrongful conduct, the Plaintiff suffered damages.

13

WHEREFORE, the Plaintiff demands from the Defendants damages, including but not limited to the sum of $180,000, together with interest, attorney's fees, costs of suit, and for such other relief as the Court deems appropriate.

## SIXTH CAUSE OF ACTION

59.     The Plaintiff repeats the allegations of all preceding paragraphs and incorporates the same into this Count as if set forth at length herein.

60.     During the period of February through May 2009, as prospective employer of the Plaintiff, the Defendants owed a duty to the Plaintiff to provide reliable and accurate information about the Avanade company.

61.     The Defendants violated this duty by providing information to the Plaintiff about Avanade that was false, misleading, and/or inaccurate.

62.     The Defendant relied upon the false, misleading, and/or inaccurate information provided by the Defendants.

63.     As a direct and proximate result of Defendants' wrongful conduct, the Plaintiff suffered damages.

14

WHEREFORE, the Plaintiff demands from the Defendants damages, including but not limited to the sum of $180,000, together with interest, attorney's fees, costs of suit, and for such other relief as the Court deems appropriate.

DAVID SCILLIERI, ESQ.
Attorney for Plaintiff

Date:  January 27, 2011

FEB. 25, 2011

15

# EXHIBIT B

STATE COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| ANDREW S. COHEN,<br><br>      Plaintiff<br><br><br>      -against-<br><br><br>AVANADE, INC., MATTHEW<br>MCCAFFERTY, and AZIZ VIRANI.<br><br>      Defendants. | INDEX NO.   102656 / 11<br><br>Plaintiff designates New York<br>County as the place of trial.<br>The basis of the venue is<br>Plaintiff's residence and<br>Defendants' Offices.<br>*AMENDED*<br>*SUMMONS*<br><br>Plaintiff's residence is:<br>45 West 67th Street, New York, New York |

*To the above named Defendants*

    *You are hereby summoned to answer the Complaint in this action and to serve a copy of your Answer, or, if the Complaint is not served with this Summons, to serve a Notice of Appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this Summons, exclusive of the day of service (or within 30 days after the service is complete if this Summons is not personally delivered to you within the State of New York); and in case of your failure to appear or Answer, Judgment will be taken against you by default for the relief demanded in the Complaint.*

Dated:  New York, New York
        March 30, 2011

                                     David Scillieri, Esq.
                                     *Attorney for Plaintiff*
                                     406 Route 46 East

Defendants' Address:                   Elmwood Park, New Jersey, 07407
                                     (201) 796-5362

Avanade Inc.
320 West 13th Street
New York, New York, 10014

Matthew McCafferty
c/o Avanade
320 West 13th Street
New York, New York, 10014

Aziz Virani
c/o Avanade
320 West 13th Street
New York, New York, 10014

NEW YORK
COUNTY CLERK'S OFFICE

MAY 17 2011

NOT COMPARED
WITH COPY FILED

18

**DAVID SCILLIERI, ESQ.**
406 Route 46 East
Elmwood Park, New Jersey 07407
(201) 796-5263
Attorney for Plaintiff

NEW YORK
COUNTY CLERK'S OFFICE

MAY 1 7 2011

NOT COMPARED
WITH COPY FILED

| | |
|---|---|
| ANDREW S. COHEN, | SUPREME COURT OF THE STATE OF NEW YORK |
| Plaintiff | COUNTY OF NEW YORK |
| vs. | |
| AVANADE, INC., MATTHEW MCCAFFERTY, and AZIZ VIRANI. | INDEX NO.   102656 / 11 |
| Defendants. | *CIVIL ACTION* |
| | **AMENDED COMPLAINT** |

The  Plaintiff, Andrew Cohen, residing at 45 West 67th Street, Apartment 12J, Manhattan, City of New York, County of New York, State of New York, by way of Complaint against the Defendants, says:

## THE PARTIES

1.      The Plaintiff, Andrew S. Cohen ("Plaintiff") is an individual residing in New York State at all relevant times pertinent to this Complaint.

2.      Upon information and belief, the Defendant, Avanade, Inc. ("Avanade")  is a company incorporated in the State of Washington.  At all times relevant to this Complaint, Avanade maintained an office in New York State, having an address of 320 West 13th Street, 5th Floor, New York, New York, 10014.

3.     The Defendant, Matthew McCafferty ("McCafferty"), at all times relevant to this Complaint, was a Vice-President of Avanade.

4.     The Defendant, Aziz Virani ("Virani"), at all times relevant to this Complaint, was an Executive Vice-President of Avanade.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

5.     During the period of February through May 2009, the Plaintiff was recruited by McCafferty and Virani on behalf of Avanade, which was seeking an individual to fill a position as a Business Development Executive in Application Management.

6.     During their recruitment of the Plaintiff, During the period of February through May 2009, McCafferty and Virani made various statements and representations to the Plaintiff which induced the Plaintiff to accept an offer of employment made by Avanade to the Plaintiff. Among these representations was the assertion that Avanade possessed a true, well-established, fully capable, and experienced Application Management delivery system and services.

7.     Based upon the representation set forth in paragraph six above, the Plaintiff accepted an offer of employment from Avanade as a Business Development Executive in Application Management which included a commission based sales compensation plan.

8.     The statements and representations made by McCafferty and Virani described in paragraph six above were false.

9.     For the reasons set forth below, Avanade did *not* possess a true, well-established, fully capable, and experienced Application Management delivery system and services at the time that the Plaintiff was hired as an Avanade employee.

2

10.    **First,** Avanade did not possess an Application Management delivery
methodology that could assure a consistent, standardized delivery approach for Application
Management services by qualified Application Management services personnel.  Instead,
Avanade only possessed three or four PowerPoint slides that described very small elements of an
Applications Management services delivery approach.  In the Plaintiff's extensive experience
selling Application Management services for well established firms such as EDS (Electronic
Data Systems), Deloitte & Touche, NTT (Nippon Telegraph and Telephone), and CSC
(Computer Sciences Corporation), each of these firms possessed Application Management
services delivery methodologies documented in hundreds of pages of text, graphic
representation, and automated toolsets.

11.    **Second,**  Avanade did not possess any qualified Application Management Service
delivery personnel on its staff.  The Avanade Applications Management team consisted of
business development executives (the Plaintiff, Sudip Mehta, Ryan Ronan, Matt McCafferty,
Chuck Follen), presales engineers (Rick Kranick and Andy Marselos), and various
finance/administration personnel.  In fact, McCafferty referred to the Avanade Application
Management team as a sales organization and not a delivery organization.  Virani referred to it as
a "start-up" organization at the team meeting held in Chicago in September 2009.

12.    **Third,** Avanade did not possess a pricing scheme or pricing model that could
address and properly price typical multi-year Application Management services deals with
clients.  Avanade Application Management services presales personnel were required to use
appropriate pricing models from Avanade's affiliate company, Accenture.  These Accenture
pricing models were not well understood by Avanade Application Management service presales

personnel. As a result presales personnel took weeks to prepare pricing schemes for the Plaintiff's deals, and often produced inaccurate or unacceptable pricing outputs.

13.    **Fourth,** Avanade did not possess structured legal documents to support Application Management services deals. When the Plaintiff joined Avanade, McCafferty indicated that he and the Avanade legal staff were still drafting these documents. During the recruiting and interview process, the Plaintiff specifically asked McCafferty if such legal documents and support were in place. McCafferty falsely stated that such documents and support were in place at Avanade. The Plaintiff's extensive experience selling complex, multi-year Application Management services deals gave him the knowledge that without such legal documentation and support in place, the deals he sought on behalf of Avanade would be unacceptably delayed.

14.    **Fifth,** Avanade did not possess well-defined, established, and tested Service level Agreement (SLA) metrics to apply in Application Management service deals with the client community. These SLAs are standard requirements in the delivery of Application Management services and well accepted as common practice within the Application Management services industry.

## Avanade Application Management Services Deals Developed by Plaintiff

15.    The Plaintiff worked in developing two major deals for Avanade in the fiscal year 2010, both of which would have closed had Avanade possessed a true, well-established, fully-capable, and experienced Application Management delivery capability, as McCafferty and Virani falsely stated was present at Avanade at the time of the recruiting and interviewing process with the Plaintiff.

16.    Together, these two deals would have exceeded $10 million in total sales for Avanade, which would have enabled the Plaintiff to achieve his full incentive bonus in fiscal year 2010 of $180,000.

17.    The first deal was for a client named Group M in New York City.  The Plaintiff spent more than three months (September 2009 –early December 2009) developing this opportunity for Avanade by meeting with and working on a daily basis with key Group M decision makers John Donnarumma (Chief Information Officer or "CIO"), Paul Gilbert, Jayne Oh, and John DeGiglio.  The Plaintiff worked extremely hard on this opportunity, working most weekends during this three-month period, as well as early mornings and late evenings.  The Plaintiff successfully negotiated the opportunity into a three-year deal that would have generated at least $5 million in sales for Avanade.

18.    However, it was during these three-months of intense effort that the Plaintiff realized that the Applications Management services delivery team tasked with preparing the proposed technical and management solutions for Group M was either seriously deficient in its complement of experienced Applications Management service delivery personnel or was woefully incompetent.  It was in fact the client's recognition of this deficiency and incompetence, especially by Mr. Gilbert, Ms. Oh, and Mr. DeGiglio, that caused them to express

their serious doubt as to Avanade's credibility in the Application Management services space, and to seek vendor support for their deal elsewhere. On more than one occasion, Ms.Oh and Mr. DeGiglio expressed this concern to the Plaintiff. They told the Plaintiff that they truly appreciated the significant effort he delivered to Group M during the three-month period, but that they had no confidence in Avanade's delivery capability. This message was delivered emphatically by Ms. Oh in a telephone call in October 2009. It was delivered again by Ms. Oh and Mr. DeGiglio during a final presentation meeting with Group M in November 2009. This message was finally delivered by Mr. Gilbert to Avanade Vice-President, Chris Paradise, in a phone call in December 2009.

19.     The Plaintiff's participation in this effort was a source of great professional embarrassment, and damaged his credibility in front of a major client in the New York based Media industry.

20.     The second and more significant deal opportunity was with a firm named Mediabrands, which is based in New York City. Starting in January 2010 and extending through the end of the Avanade fiscal year 2010, the Plaintiff made significant efforts to develop this substantial deal opportunity for Avanade.

21.     Had the Mediabrands deal closed, it would have generated in excess of $10 million in sales for Avanade over a multi-year period. This deal was lost because Avanade did not possess a well established and capable Applications Management service delivery team, a detailed methodology for Application Management service delivery, and a credible service delivery team with the requisite skill sets.

22.     The Plaintiff developed the opportunity with Mediabrands in collaboration with Steve MacKinnon (a Business Development Executive in Avanade's New York office) and Jim

6

Olson (Zone Director in Avanade's New York office). MacKinnon and Olson had already successfully sold an applications development project to Mediabrands. Therefore, Mediabrands was an existing client for Avanade. The Plaintiff was presented to the Mediabrands CIO, Scott Beltran, in order to begin and manage the Application Management deal sales cycle, and to interact with the Application Management service delivery team, whose responsibility was to accurately scope the composition of the deal and define a credible level of effort estimate, a solution plan, and deal pricing.

23.     Avanade's services delivery team was unable to accomplish any of its responsibilities. The team, consisting of Avanade personnel Rick Krajnik, Andrew Marselos, and Lily Gui, did not possess the experience or appropriate skill sets necessary to accomplish these tasks. After the Plaintiff expended significant efforts on the Mediabrands deal, which included composing and leading a deal scoping process (which in reality was a responsibility of the Applications Management services delivery team), traveling to and working in Asia for over two weeks, it became evident to Avanade's executive leadership that Avanade did not possess the experience and skill sets to develop and deliver an Applications Management deal. This became evident to the Plaintiff in a series of conference calls in June of 2010, in which Avanade senior executives Howard Kilman, Jack Dreiss, Mick Slattery, Virani and CEO, Adam Warby, participated. Jim Olson, McCafferty, Rick Krajnik, Andrew Marselos, Steve MacKinnon, and the Plaintiff also participated in these calls.

24.     It was during these calls that Jack Dreiss first raised the issue of risk of delivery for this potential deal with Mediabrands. Dreiss showed great concern in this respect, and explicitly stated that Avanade had never delivered a deal of this type - a statement in sharp contradiction to what the Plaintiff was told by McCafferty and Virani during the Plaintiff's

recruiting process.  Mr. Dreiss was responsible for overall service delivery for Avanade in its Americas region.  Howard Kilman, the Avanade executive responsible for all Americas region business, echoed Mr. Dreiss' comments.  He agreed that Avanade had never delivered such a deal and that it would be the company's first.  Mr. Kilman even commented at one point during these calls that "we do not know what we are doing in this space but we want to be in it," which clearly expressed Avanade's lack of a well established and credible Applications Management service delivery capability.  Virani and McCafferty, both on the calls, did not contradict Mr. Kilman's or Mr. Dreiss' statements.

25.     All involved in these calls suggested that Avanade borrow from its affiliate, Accenture, a well established firm in the Application Management services delivery space, the appropriate methodology, estimating tools, pricing model, and ultimately, the appropriate human resources with the appropriate skill sets.  Mr. Dreiss explicitly stated in a conference call on or about June 15, 2010, that "we have not done this before so using Accenture's approach and models is best."  In the end, Avanade personnel were not capable to use the borrowed Intellectual Property of Accenture and Avanade was not successful in attempting to borrow Accenture experienced personnel.  As a result, the Mediabrands deal collapsed.

26.     Both Jim Olson and Steve MacKinnon, recognizing Avanade's lack of experience and capability in the Application Management service delivery space, refused to allow Avanade to bring a proposal to the Mediabrands CIO (Scott Beltran), for this potential deal.  This assured the deal's failure.  At one point in the New York office, Jim Olson and colleague Zone Executive Ed Schwartz, joked that the Plaintiff should go out and get an experienced firm that could fulfill the deal for Mediabrands, given Avanade's lack of capability in this area.

8

27.     This experience greatly embarrassed the Plaintiff, and damaged his credibility in front of Mediabrands CIO, Scott Beltran, a major player in the large New York based Media industry.

28.     Avanade hired the Plaintiff without possessing the appropriate capability to credibly propose and deliver Applications Management service deals.  As a result, the Plaintiff was denied the opportunity to close two major deals that would have generated his full incentive bonus of $180,000 for the fiscal year 2010.

29.     The Plaintiff also endured professional embarrassment and had his professional reputation damaged as a result of Avanade's inability and incompetence.

30.     The Plaintiff's employment with Avanade ended on September 16, 2010.


## FIRST CAUSE OF ACTION


31.     The Plaintiff repeats the allegations of all preceding paragraphs and incorporates the same into this Count as if set forth at length herein.

32.     Under the employment contract and arrangements, the Plaintiff was to be compensated by Avanade in several ways, pursuant to specific formulas and other provisions.

33.     The Plaintiff's contract of employment with Avanade included the provisions contained in the Avanade Total Rewards Sales Compensation Plan for the Avanade Fiscal Year (September 1, 2009-August 31, 2010).

34.     Had Avanade possessed a true, well-established, fully-capable, and experienced Application Management delivery capability, the deals worked on and negotiated by the Plaintiff

9

with both Group M and Mediabrands would have come to fruition and would have resulted in a finalized contract with those entities.

35.    In the event that the Group M and Mediabrands deals had been finalized, pursuant to the Avanade Total Rewards Sales Compensation Plan for the Avanade Fiscal Year (September 1, 2009-August 31, 2010), the Plaintiff would have earned $180,000.

36.    With respect to the Group M and Mediabrand assignments, the Plaintiff duly performed for Avanade all of the services and other duties which he had undertaken and promised to do under the employment agreement and arrangements.  In this respect, the Plaintiff tendered substantial performance under his employment contract with Avanade.

37.    By failing to possess a true, well-established, fully-capable, and experienced Application Management delivery capability, Avanade materially breached its contract with the Plaintiff.

38.    The Plaintiff has failed and refused to compensate the Plaintiff for the substantial performance of his duties with regard to the Group M and Mediabrands deals.

39.    As a consequence of Avanade's breach, there is now due and owing from Avanade to the Plaintiff the sum of $180,000, together with interest thereon from September 16, 2010.

WHEREFORE, the Plaintiff demands from the Defendants the sum of $180,000, together with interest, attorney's fees, costs of suit, and for such other relief as the Court deems appropriate.

## SECOND CAUSE OF ACTION

40.     The Plaintiff repeats the allegations of all preceding paragraphs and incorporates the same into this Count as if set forth at length herein.

41.     During their recruitment of the Plaintiff, during the period of February through May 2009, McCafferty and Virani made various statements and representations to the Plaintiff which induced the Plaintiff to accept the offer of employment made by Avanade to the Plaintiff. Among these representations was the assertion that Avanade possessed a true, well-established, fully capable, and experienced Application Management delivery system and services. Specifically, during the employment interviewing process, when Mr. Cohen asked Mr. McCafferty if Avanade possessed a detailed methodology to deliver complex, multi-year, multi-million dollar application management deals to its customers, Mr. McCafferty said "yes". When Mr. Cohen asked Mr. McCafferty if Avanade possessed a deal pricing team experienced in the complex pricing requirements of a multi-year, multi-million dollar application management deal, Mr. McCafferty said "yes". When Mr. Cohen asked Mr. McCafferty if Avanade possessed a legal team and legal application management deal agreement construct that addressed the legal issues embedded in a complex, multi-year, multi-million dollar application management deal, Mr. McCafferty said "yes". When Mr. Cohen asked Mr. McCafferty if Avanade possessed a delivery team and delivery personnel experienced in the delivery of many complex multi-year, multi-million dollar application management deals for Avanade's customers, Mr. McCafferty said "yes". Moreover, Mr. McCafferty said that "Avanade possessed a substantial application management delivery capability that needed sales people to sell it in the United States." Within weeks of Mr. Cohen's employment with Avanade, he discovered that Avanade did not possess

11

any of these capabilities. In September of 2009 at a meeting in Chicago, Mr. Aziz Virani, Executive Vice President of Avanade called the application management delivery organization a "start up business". In June of 2010, on a teleconference meeting, Mr. Howard Kilman of Avanade stated that "we have no experience doing this kind of work," and Mr. Jack Dreiss of Avanade stated that "we do not know what we are doing," in application management delivery. Mr. McCafferty and Mr. Virani, both on this teleconference meeting, did not contradict or disagree with Mr. Kilman's or Mr. Dreiss's statements.

During the employment interviewing process, Mr. Cohen asked Mr. Virani if Avanade possessed the capability to deliver complex, multi-year, multi-million dollar application management deals for its customers, Mr. Virani said "yes". Mr. Virani asked Mr. Cohen during the interview process if he "really wanted to sell these services," clearly implying that the services existed and that Mr. Cohen was being hired to sell the services, not build the service delivery organization.

42.   Based upon these representations set forth in paragraph 41 above, the Plaintiff accepted an offer of employment from Avanade as a Business Development Executive in Application Management.

43.   Plaintiff entered into his employment with Avanade in reliance upon the statements and representations set forth in paragraph 41 above.

44.   The statements and representations made by McCafferty and Virani described in paragraph 41 above were materially false.

45.   Plaintiffs' willingness to assent to the employment contract with Avanade was caused by the material fraudulent misrepresentations of Avanade and its agents and employees.

12

46.    The Plaintiff has been damaged by the actions of Avanade and its agents and employees.

WHEREFORE, the Plaintiff demands from the Defendants damages, including but not limited to the sum of $180,000, together with interest, attorney's fees, costs of suit, and for such other relief as the Court deems appropriate.

## THIRD CAUSE OF ACTION

47.    The Plaintiff repeats the allegations of all preceding paragraphs and incorporates the same into this Count as if set forth at length herein.

48.    The conduct of Avanade and its agents and employees towards the Plaintiff was malicious, fraudulent, oppressive and/or recklessly committed, with wanton disregard of the Plaintiff's rights.

49.    The conduct of Avanade and its employees and agents exhibited bad faith.

WHEREFORE, the Plaintiff demands from the Defendants damages, including but not limited to the sum of $180,000, and punitive damages, together with interest, attorney's fees, costs of suit, and for such other relief as the Court deems appropriate.

## FOURTH CAUSE OF ACTION

50.    The Plaintiff repeats the allegations of all preceding paragraphs and incorporates the same into this Count as if set forth at length herein.

13

51.     Avanade's failure to possess the promised true, well-established, fully capable, and experienced Application Management delivery system and services directly caused the failure of the Plaintiff to consummate the deals with Group M and Mediabrands.

52.     This experience greatly embarrassed the Plaintiff, and damaged his credibility in front of Mediabrands CIO, Scott Beltran, a major player in the large New York based Media industry.

53.     This experience also greatly embarrassed the Plaintiff, and damaged his credibility in front of Group M and its employees, a major client in the New York based Media industry.

54.     The Plaintiff endured professional embarrassment and had his professional reputation damaged as a result of Avanade's inability and incompetence.

WHEREFORE, the Plaintiff demands from the Defendant damages, including but not limited to compensatory damages, in an amount not less than $1,000,000, punitive damages, plus interest, attorney's fees, costs of suit, and for such other relief as the Court seems appropriate.


**FIFTH  CAUSE OF ACTION**


55.     The Plaintiff repeats the allegations of all preceding paragraphs and incorporates the same into this Count as if set forth at length herein.

56.     In making the representations referred to in paragraph 41 above, the Defendants owed Plaintiff a duty to provide him with accurate advice which was in the Plaintiff's best interests.

14

57.     In making the representations referred to in paragraph 41 above, the Defendants acted negligently and unreasonably and breached this duty by advising the Plaintiff that Avanade possessed a true, well-established, fully capable, and experienced Application Management delivery system and services.

58.     As a direct and proximate result of Defendants' wrongful conduct, the Plaintiff suffered damages.

WHEREFORE, the Plaintiff demands from the Defendants damages, including but not limited to the sum of $180,000, together with interest, attorney's fees, costs of suit, and for such other relief as the Court deems appropriate.

## SIXTH CAUSE OF ACTION

59.     The Plaintiff repeats the allegations of all preceding paragraphs and incorporates the same into this Count as if set forth at length herein.

60.     During the period of February through May 2009, as prospective employer of the Plaintiff, the Defendants owed a duty to the Plaintiff to provide reliable and accurate information about the Avanade company.

61.     The Defendants violated this duty by providing information to the Plaintiff about Avanade that was false, misleading, and/or inaccurate.

62.     The Defendant relied upon the false, misleading, and/or inaccurate information provided by the Defendants.

15

63.     As a direct and proximate result of Defendants' wrongful conduct, the Plaintiff

suffered damages.

WHEREFORE, the Plaintiff demands from the Defendants damages, including but not

limited to the sum of $180,000, together with interest, attorney's fees, costs of suit, and for such

other relief as the Court deems appropriate.


DAVID SCILLIERI, ESQ.
Attorney for Plaintiff


Date:   March 30, 2011

16

**DAVID SCILLIERI, ESQ.**
406 Route 46 East
Elmwood Park, New Jersey 07407
(201) 796-5263
Attorney for Plaintiff

|  |  |
|---|---|
| ANDREW S. COHEN, | SUPREME COURT OF THE STATE OF NEW YORK |
| Plaintiff | COUNTY OF NEW YORK |
| vs. | INDEX NO.    102656 / 11 |
| AVANADE, INC., MATTHEW MCCAFFERTY, and AZIZ VIRANI. | *CIVIL ACTION* |
| Defendants. | **VERIFICATION OF PLEADINGS** |

State of New York          }
County of New York        }

Andrew S. Cohen, of full age, being duly sworn according to law, on his oath, says:

1.  I reside at 45 West 67th Street, Apartment 12J, Manhattan, City of New York, County of New York, State of New York, and I am the plaintiff in the above entitled action.

2.  I have read the foregoing Complaint and on my own personal knowledge, I know that the facts set forth therein are true and they are incorporated in this affidavit by reference.

_____
ANDREW S. COHEN, plaintiff

Sworn and subscribed to before me this ___31___ day of MARCH, 2011

_____
Notary Public-State of New York
My commission expires              20

17

DAVID SCILLIERI
ATTORNEY AT LAW
OF THE STATE OF
NEW JERSEY